**Charlene RYGG, et al., Plaintiffs,**

v.

**COUNTY OF MAUI, et al., Defendants.**

**No. CIV. 98–00874 ACK.**

United States District Court,
D. Hawaii.

Aug. 3, 2000.

Order Denying Motion to °Amend
Sept. 15, 2000.

James Krueger, Law Offices of James Krueger, Wailuku, Frank B. Morrison, Jr., Morrisons McMarthy & Baraban, Whitefish, MT, for Charlene Rygg, Individually, Philip John Rygg, Estate of, Deceased exc Charlene Rygg, Adam E. Noble, Jeffrey W. Weyh, Rebecca Rygg, Philip John Rygg, II, plaintiffs.

Kenneth S. Robbins, Vincent A. Rhodes, Honolulu, Milton S. Tani, Wailuku, Maui, Ryan M. Akamine, Roeca Louie & Hiraoka, Honolulu, for Maui, County of, Aston Hotels & Resorts dba Aston at the Maui Banyan, John Does 1–5, John Doe Corporations 1–5, John Doe Partnerships 1–5, Roe Non–Profit Corporations 1–5, Roe Governmental Agencies 1–5, defendants.

## DECISION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, District Judge.

This case arises out of a tragic accident that occurred at Kamaole Beach Park II ("Kamaole II") on Maui, Hawaii, on March 13th, 1998. On that day, Mr. Philip John Rygg of Montana, on vacation with his family on Maui, was injured by a shorebreak wave at Kamaole II.

Mr. Rygg's suffered severe spinal injuries. Mr. Rygg, who led an active life, was left debilitated and bed-ridden. Despite intensive rehabilitation efforts, he never recovered. Mr. Rygg passed away as a result of complications from his injuries on May 28, 1998.

The Court notes that Mr. Rygg was a fine man and loving father who was widely admired for his work in his community, church, and business. He was a devoted family man, who was loved very much by his wife and children. The Court offers its sincere condolences to Mr. Rygg's family for its loss.

Plaintiffs, Mrs. Charlene Rygg, Mr. Rygg's widow, on behalf of herself and the estate of Mr. Rygg; as well as Mr. Rygg's children, Adam Noble, Rebecca Rygg, and

Philip John Rygg II; and Mrs. Rygg's son from a previous marriage, Jeffrey Weyh, filed the instant suit against Defendant County of Maui ("County").

This matter came on for bench trial before this Court beginning June 20, 2000. Having heard and weighed all the evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having visited and examined the site of the accident, having heard the arguments of counsel and considered the memoranda submitted, and based upon the following Findings of Fact and Conclusions of Law, the Court holds that Defendant fulfilled its duty of providing adequate warning of the extremely dangerous shorebreak present at Kamaole II on March 13, 1998.

### FINDINGS OF FACT

1. PHILIP JOHN RYGG ("Phil"), deceased, was a resident of Montana. He died on May 28, 1998 as a complication of paralyzing injuries suffered by him on March 13, 1998, at Kamaole II Beach Park in Maui, Hawaii.

2. Plaintiff CHARLENE RYGG ("Char") was born on February 15, 1947. She is Phil's widow.

3. Char is the personal representative of the Estate of PHILIP JOHN RYGG, deceased.

4. ADAM E. NOBLE, born December 6, 1972, JEFFREY W. WEYH, born April 19, 1968, REBECCA RYGG ("Becky"), born December 14, 1975, and PHILIP JOHN RYGG, II ("John"), born July 10, 1980, were the natural, adopted and/or stepchildren of Phil.

5. Plaintiffs were, at all times relevant herein, citizens and residents of the state of Montana. No plaintiff was a citizen or resident of the State of Hawaii.

6. The County of Maui ("County"), is a duly formed body politic amenable to service herein over which this Court has jurisdiction.

7. The County owned and maintained, among others, a certain public beach on the island of Maui, State of Hawaii, known as Kamaole Beach Park II, located in Kihei. The beach and ocean fronting Kamaole II is owned by the State of Hawaii.

8. Kamaole II lay on the ocean ("makai") side of a public way, known as South Kihei Road, located in Kihei, Maui, Hawaii.

9. South Kihei Road is a two-lane street and has substantial vehicular traffic.

10. Kamaole II is a beach park that has a narrow grassy area next to the sidewalk adjacent to South Kihei Road.

11. Makai of the grassy portion of Kamaole II are napaka plants and the beach, adjacent to which is the Pacific Ocean.

12. On the mountain ("mauka") side of South Kihei Road, across the street from Kamaole II, is the Aston at The Maui Banyan ("Banyan"), a resort hotel/condominium.

13. Mary Roper, Phil's sister, is forty-three years old and lives in Kalispell, Montana, with her husband, Jeff Roper ("Jeff"), and sons Jess, age twenty, and Reid, age fifteen. The Roper family accompanied the Ryggs to Maui on March 12, 1998.

14. While on Maui, the Rygg and Roper families were guests at the Banyan.

15. The driveway and sidewalks leading from the Banyan to South Kihei Road intersect South Kihei Road near the southern end (toward Wailea) of Kamaole II. The nearest crosswalk spanning South Kihei Road is approximately 164 feet north (toward Kihei) of the intersection of the Kihei sidewalk alongside the Banyan driveway and South Kihei Road.

16. Almost directly across South Kihei Road from the Kihei sidewalk of the Banyan is a path to the beach at Kamaole II. This accessway is the second access from the Wailea boundary of Kamaole II. This was the path used by Phil and his family to access the beach from the grassy portion of Kamaole II on the evening of March 12,

1998, and the morning of March 13, 1998. This accessway has been referred to as the "Rygg" path. *See* Exh. P–26.

17. The Legislature adopted Act 190, 1996 Session Laws of Hawaii ("Act 190" or "Act") to provide for public land liability immunity. The Act provides a conclusive presumption that the signage at a public beach park is legally adequate if such signage is approved as to design and placement by the Board of Land and Natural Resources ("BLNR") chairman in consultation with the Act-created Task Force on Beach and Water Safety ("Task Force").

18. The Task Force inventoried, in 1996 and 1997, beaches throughout the Hawaiian islands with a view toward ascertaining what beaches on each island were associated with dangerous aquatic conditions.

19. In connection with dangerous aquatic conditions found by the Task Force at the aforesaid island beaches, the Task Force was to not only identify the hazard existing thereat, but, in addition, develop and approve appropriate signs warning of said conditions, in particular, extremely dangerous shorebreak and strong currents, and causing them to be installed by the various counties of Hawaii at the respective beaches where such conditions existed.

20. Because the pictogram of the shorebreak warning signs at Kamaole II, on March 13, 1998, were not approved by the Task Force, or the chairperson of the BLNR, the County is not entitled to any conclusive presumption that any warnings given by it pertaining to shorebreak were legally adequate or sufficient. The County acknowledged, prior to trial, that it was not entitled to such a presumption because it failed to use the Task Force approved pictogram on its shorebreak warning signs at Kamaole II.

21. In late 1996 or 1997, the Task Force recommended to the director a shorebreak warning sign, for approval and use, depicting a wave curling about the mid-body of an upside down person. *See* Exh. C–30.

22. The Task Force's recommendation of this sign, depicting such pictogram, was intended to reflect the statistical data on shorebreak accidents (the "Howe Study"). However, the Howe study reports that ninety percent of injuries caused by shorebreak to swimmers occurred in shorebreak of three feet or less. The estimated wave heights are as observed by lifeguards, who measure waves from the back. The measurements thus translate into waves up to six feet (approximately twice the height measured from the back of the wave) from trough to crest (the face of the wave).

23. Dr. Richard Grigg, from 1996 to the present, served as an appointed member of the Task Force. He testified as an expert witness called by plaintiffs. Dr. Grigg has expertise in oceanography, water safety, and signage relating to warnings of hazards existing in aquatic environments.

24. Dr. Grigg misinterpreted the Howe Study as measuring waves from the front, or as taking an average of the two measurements (front and back).

25. Based on Dr. Grigg's interpretation of the Howe Study, Dr. Grigg encouraged the Task Force to adopt the new shorebreak warning sign, with a pictogram depicting a person falling in front of a wave with a face of approximately two feet in height, as Dr. Grigg thought such a pictogram would more adequately represent the dangers of shorebreak injury. Mr. Ralph Goto, the administrator for the Ocean Safety and Lifeguard Services Division of the City and County of Honolulu, testified, on behalf of Defendant, that waves with a face of two to three feet are capable of causing serious injury. Mr. Goto served on the Task Force from its inception in 1996 to the present time.

26. In September of 1997, the chairman of the BLNR, in conjunction with the Task Force, approved a plan submitted by the County of Maui that identified danger-

ous beaches on the island of Maui, and extremely dangerous shorebreak and strong currents thereat, together with proposed locations of warning signs applicable to said conditions.

27. The Task Force approved the use of certain signage placement guidelines ("Goto criteria") on March 3, 1997, and subsequently formally approved the guidelines on February 8, 1998.

28. Mr. Ralston Nagata is the State Park Administrator for the State of Hawaii in the Department of Land and Natural Resources, Division of State Parks. Mr. Nagata, who testified on behalf of Defendant, served on the Task Force as the designee of the chairperson of the BLNR.

29. Both Messrs. Goto and Nagata testified that the Goto criteria were simply guidelines (as opposed to rules regulating signage placement) for placement of signs under the conclusive presumption of legal adequacy as provided in Act 190.

30. In February, 1997, in connection with the County's first signage proposal submitted that month, the Task Force visited County beaches, including Kamaole II, spending from five to fifteen minutes thereat.

31. The Task Force subsequently rejected the County's first signage proposal.

32. The County submitted a second signage proposal, which included a plan for placing five dangerous shorebreak and strong current signs at Kamaole II.

33. Only five accessways were depicted on the map of Kamaole II that was provided to the Task Force in connection with the County's second signage proposal. The Rygg path was not one of the five paths depicted. *See* Exhs. P–31; C–94.

34. There actually were nine accessways running from the grassy area of Kamaole II to the beach at the time the County submitted its second signage proposal.

35. The maps submitted by the various counties were not intended to represent every accessway and feature of the respective parks. Most of the maps submitted were tax maps that did not even show beach access ways. Moreover, both Messrs. Goto and Nagata testified that each pathway did not have to have a sign at its inception to adequately warn the public of extremely dangerous shorebreak; nor did the Task Force require that all accessways be signed.

36. The signage plan for Kamaole II proposed that five of the Task Force approved dangerous shorebreak and strong current warning signs be posted near the five accessways depicted on the map.

37. The Task Force approved the County's second plan in September of 1997.

38. Dr. Grigg testified that, as a member of the Task Force, he would not have approved the County's second signage proposal with respect to Kamaole II had he known that not all accessways were shown on Exhibit C–94, and not all accessways were individually signed.

39. Had Dr. Grigg known that the wooden ramp and Rygg accessways were not marked on Exhibit C–94, nor that they were not proposed for signing, he would not have approved the County's second signage proposal with respect to Kamaole II.

40. Mr. Wilfred Enriques, through the fall of 1997, had been the County's governor-appointed representative to the Task Force.

41. Mr. Enriques testified that he would not have submitted the second signage proposal to the Task Force had he known that the wooden ramp at Kamaole II was not proposed for signing.

42. Mr. Enriques testified that he would not have submitted the County's second signage plan had he known that the Rygg accessway existed *and* was not proposed for signing.

43. The County placed Mr. Enriques on suspension in October of 1997, some six

months prior to the subject accident. He is no longer employed by the County.

44. In approving the County's second plan, the Task Force relied upon the County's knowledge of its beach, and relied upon the County following the Goto criteria in preparing the plan. There was no evidence, however, that any of the counties submitted data showing compliance with the Goto guidelines. The Task Force also relied upon its visit to Kamaole II and other County beaches in February of 1997.

45. Marian Feenstra, Chief of Aquatics, Department of Parks and Recreation, County of Maui, since 1996, in her capacity as an employee of the County, authorized her secretary, in early 1998, Isabel Eisenberger, to prepare and obtain a new shorebreak graphic, consistent with the newly approved Task Force shorebreak warning graphic, and cause new signs to be installed at various beaches on the County, including Kamaole II.

46. Ms. Feenstra was the County's representative to the Task Force from and after January 1998.

47. Ms. Eisenberger failed to utilize the appropriate graphic, as approved by the Task Force, and as Ms. Feenstra requested that she obtain. Instead, Ms. Eisenberger obtained and caused new signs to be posted at the various beaches on Maui whereat extremely dangerous shorebreak conditions were deemed to exist, including Kamaole II, but the pictogram affixed thereto was the old pictogram showing the shorebreak wave, of approximately four feet in height (measured from the front), curling above the feet of a bent over, upside down person, and hurling him downward toward the floor of the ocean. *See* Exh. C–29.

48. Despite that the pictogram was different, the sign Ms. Eisenberger ordered to be posted at Kamaole II contained the Task Force approved coloration, layout, and verbiage: "WARNING/DANGEROUS SHOREBREAK/WAVES BREAK IN SHALLOW WATER/SERIOUS IN- JURIES COULD OCCUR, EVEN IN SMALL SURF/IF IN DOUBT, DON'T GO OUT[.]"

49. The Kamaole II pictogram in use on March 13, 1998, was promulgated by the Hawaiian Lifeguarding Association and the United States Lifesaving Association, and was the standard graphic used by various agencies for many years across the state until installation of the Task Force signs began in the months and weeks preceding the incident.

50. While the actual signs are in evidence, measurements of the signs were not specified. For the ready reference of the reader, the Court provides the following approximate description of the "Dangerous Shorebreak" sign in use on March 13, 1998. The sign is 2 feet in height and 1½ feet wide. At the top of the sign is the word "WARNING," with the lettering in black and with an orange background, which in turn has a black border. The letters are one and ¾ inches high and ¼ inch thick. Below the word "WARNING" is a pictogram within a yellow diamond. The yellow diamond is 9 ⅝ inches by 9 ⅝ inches. The pictogram within the yellow diamond is in black and shows a shorebreak wave of approximately four feet in height (measured from the front or face of the wave and dependent upon the size of the person depicted), curling above the feet of a bent over, upside down person, and hurling the person downward toward the floor of the ocean. Below the pictogram are the words "DANGEROUS SHOREBREAK" in black letters that are 1 ¾ inches high and ¼ inch thick. Below those words are the following: "WAVES BREAK IN SHALLOW WATER/SERIOUS INJURIES COULD OCCUR, EVEN IN SMALL SURF," in black letters that are ⅝ inch high and ¹⁄₁₆ inch thick. Below those words are the words "IF IN DOUBT, DON'T GO OUT," in black letters that are ¹¹⁄₁₆ inch high and ⅛ inch thick. The black border around the word "WARNING," which has an orange background, is 4½ inches in height and runs the

entire width of the sign. The background for the entire sign thereunder is white.

51. Shane Bosque has been employed by the County, Department of Parks and Recreation, as a park caretaker for eight years.

52. Mr. Bosque is familiar with and did work at the Kāmaole I, Kamaole II and Kamaole III beach parks.

53. On March 4, 1998, Mr. Bosque installed five dangerous shorebreak and strong current warning signs at Kamaole II.

54. The size, coloration, layout, and verbiage of the Kamaole II signs that Mr. Bosque posted were identical to the Task Force approved sign. The only difference was in the diamond-shaped yellow and black pictogram that graphically depicted shorebreak conditions. Mr. Goto testified that the old pictogram gave a more adequate warning of the shorebreak conditions existing at Kamaole II on March 13, 1998, than the newer, Task Force approved pictogram.

55. The differences between the Kamaole II pictogram and the Task Force pictogram are insignificant from the perspective of an ordinary beachgoer. While the Task Force pictogram may have been intended by certain Task Force members to reflect the statistical data on shorebreak accidents, it ' is questionable whether it would lead to any greater appreciation of shorebreak risks. Moreover, the data has been inconclusive whether the new pictogram is more effective at preventing shorebreak accidents than the old pictogram displayed at Kamaole II on March 13, 1998. That is, there is no evidence that the Task Force pictogram is any more effective in modifying human behavior.

56. The ocean conditions existing on March 13, 1998, including the wave involved in Phil's injury, were more closely depicted in the Kamaole II pictogram in use that day, than in the Task Force pictogram. Further, the Kamaole II pictogram existing on March 13, 1998, more closely depicts the manner in which Phil was injured, and contained verbiage that clearly indicated the potential dangers associated with ocean conditions.

57. Char testified that her reaction would have been the same had she seen either pictogram.

58. The shorebreak warning sign, including the pictogram, used by the County on March 13, 1998, was adequate and appropriate, and well within the appropriate standard of care.

59. On March 13, 1998, the County had five dangerous shorebreak signs posted at fixed locations on the premises of Kamaole II. The Court will refer to these signs as numbers one through five: sign one being the sign on the Kihei side of Kamaole II, and sign five on the Wailea end.

60. Mr. Bosque posted sign five about three feet makai of the sidewalk on park grass, at the Wailea end of Kamaole II. Mr. Bosque posted the dangerous shorebreak warning sign on the same post as, and directly underneath a strong current warning sign of exactly the same height and width. The top of the strong current sign to the bottom of the shorebreak warning sign measures four feet.

61. The location of sign five was approved by the Task Force. Mr. Bosque posted sign five in the approved location, although he placed the sign a few feet closer to the Rygg path than the actual location approved by the Task Force; Mr. Bosque did so in order to make the sign more visible, as it otherwise would have been placed in the napaka plants.

62. Although Mr. Goto testified that in hindsight it may have been better to have located the sign within five to ten feet of the inception of the Rygg path, it is the attention-getting quality of the sign that is significant, even from a distance; the smaller printed words need not be legible from the inception of the Rygg path in order to provide adequate warning of extremely dangerous shorebreak.

63. The site visit gave the Court a much better perspective of the entire park and beach area of Kamaole II than was depicted by the photographs and video, especially because the park area is actually much more compact than depicted in the photographs and video.

64. Walking on the Kihei sidewalk from the Banyan towards Kamaole II, sign five is visible from a distance of at least 100 feet from the corner of the Banyan sidewalk and South Kihei Road. From the corner, both signs three and five, as well as the red flag (when posted in the sand makai of the lifeguard tower) are visible, and the language "WARNING" and "DANGEROUS SHOREBREAK" and "STRONG CURRENT" is legible on sign five, as well as the pictogram thereon. Sign five remains clearly observable as one walks across the street directly toward the Rygg path.

65. From the entry to the Rygg path, one can read on sign five the words "WARNING," "DANGEROUS SHORE-BREAK," "STRONG CURRENT," and the smaller print, depending on one's vision. The pictogram is also readily seen. As Phil approached the Rygg path heading toward the beach, he should have seen and read sign five.

66. From the crosswalk nearest the Banyan, on the mauka side of the street, signs five and three are readily observable. Walking in the Kihei direction, signs one, two, and three are also readily observable.

67. The coloration of the dangerous shorebreak signs (orange, yellow, black and white) and the word "WARNING" printed upon the signs attract attention and clearly denote a need for caution from a distance of more than 100 feet from each sign.

68. Sign five, located 45 feet from the inception of the Rygg path, was sufficiently close to the Rygg path so as to adequately warn anyone passing over the Rygg path of the dangers of shorebreak.

69. Although Plaintiffs asserted that sign five was placed at a right angle to pedestrians walking from the Banyan across South Kihei Road, such that the sign was barely in one's peripheral vision when walking in a makai direction toward the beach, the Court's visitation clearly indicated otherwise: sign five is directly observable and obvious to pedestrians walking along the Kihei sidewalk of the Banyan, at the corner of South Kihei Road, as one crosses the street toward the beach, and as one walks from the sidewalk toward the Rygg path.

70. The five signs gave adequate notice to anyone using any of the paths on Kamaole II, as well as anyone walking on either the mauka or makai sidewalk of South Kihei Road, of the dangerous shore-break present at Kamaole II.

71. As one walks on the Rygg path toward the beach, the red flag is readily observable—in one's direct line of vision—when posted in the sand, makai of the lifeguard tower, either half way to the water's edge or closer to the tower.

72. The red flag is also easily observed from the area where the Ryggs were sitting on the beach, when posted in either position, and from the area in the ocean where Phil was the morning of March 13, 1998.

73. The red flag, when posted in the sand, makai of the lifeguard tower, half way to the water's edge, is visible from the corner of the Kihei sidewalk of the Banyan and South Kihei Road.

74. From the lifeguard tower, one could see people approaching the beach on the Rygg path as well as those situated on the beach in the area where the Rygg and Roper families were situated on the morning of March 13, 1998. One could also see, from the lifeguard tower, people in the area of the ocean where Phil had been before the time of his accident.

75. Kaleo Amadeo has been a County lifeguard for the last eight years and has worked at all three Kamaole beaches.

76. Mr. Amadeo testified that a sandbar always exists off Kamaole II beach whose distance offshore varies depending on ocean swells.

77. Dr. Grigg testified that the drop off from the Kamaole II sandbar toward the ocean is fifteen degrees.

78. Stan Zitnik is a Recreation Specialist for Maui County, Department of Parks and Recreation.

79. Before becoming a Recreation Specialist, Mr. Zitnik worked for 13 years as a Maui County Water Safety Officer I, II, and III.

80. Mr. Zitnik first began to work at Kamaole II in 1985.

81. In 1997, Mr. Zitnik was the district captain of South Maui, which included Kamaole I, II, and III.

82. Mr. Zitnik was aware that ocean conditions, including the subsea terrain, made shorebreak at Kamaole II extremely dangerous.

83. The subsea terrain, or ocean floor, at Kamaole II, dropped off steeply, so that, when an incoming swell approached, it would shallow quickly and could cause extremely dangerous shorebreak.

84. In some conditions, the plunging manner of the shorebreak can result in slamming people head first into the ocean bottom, which can result in breaking of the spinal cord when the swimmer contacts the ocean floor.

85. Given the record of accidents on the beach at Kamaole II (in evidence are records of accidents occurring at Kamaole II in 1987 (Zitnik), 1994 (Peck), and 1998 (Russell and Lowen), and at Kamaole I in 1998 (Rowland)), depending on the surf, the County was aware or should have been aware that extremely dangerous shorebreak conditions could be present.

86. Cary Kayama is a 29 year old County lifeguard who has worked for the County since 1994.

87. Since 1997, Mr. Kayama has been a lifeguard permanently stationed in Kihei, and for the three years previous to that, Mr. Kayama often worked at the Kamaole beaches.

88. According to Mr. Kayama, it is common knowledge among County lifeguards that a sandbar exists offshore Kamaole II which can be extremely dangerous at times.

89. Because of the location of the sandbar underwater, unless someone had a background in oceanography or had been in the water and had had some aquatic experience, a person, such as a first time visitor, would not know of the sandbar nor the sandbar's influence on creating dangerous shorebreak.

90. Mr. Kayama was familiar with the type of injuries caused by dangerous shorebreak, which included paralysis.

91. Dr. Grigg testified that the waters offshore the portion of Kamaole II, from the center of Kamaole II to its Wailea boundary, was an area most prone to the occurrence of dangerous shorebreak. This is the area where Phil's accident occurred.

92. Dr. Grigg testified that the shorebreak at Kamaole II was extremely dangerous and deserving of specific warning.

93. Glen Egstrom obtained a Ph.D. from U.S.C. in 1961. He was called as a defense expert witness.

94. A question of Dr. Egstrom's expert background and experience in signage was raised. At the conclusion of his testimony, plaintiffs withdrew their objection to his testimony on warnings. The Court noted that Dr. Egstrom appeared to have limited experience with shorebreak, surf, and beach warning signs.

95. Dr. Egstrom opined that the language and placement of the dangerous shorebreak signs at Kamaole II on March 13, 1998, were adequate.

96. Egstrom opined that, without a scientific study establishing the efficacy of beach warning signs, it would be specula-

tive how anyone's behavior would be influenced by a shorebreak warning sign. Partly because of such opinion, the Court did not qualify Dr. Egstrom as an expert in the *efficacy* of beach warning signs. The Court notes that Dr. Grigg's opinion faced the same problem, particularly since he misinterpreted the data from the Howe Study as measuring a wave from the front. (In fact, Dr. Grigg surmised that the Howe Study may have taken an average of the wave's measurements from both the front and the back.)

97. Mr. Kayama worked at Kamaole II on March 13, 1998, as a water safety officer.

98. Mr. Kayama was the only lifeguard on duty at Kamaole II on March 13, 1998 when Phil was injured.

99. In the Water Safety Officer Station Log from March 13, 1998, Mr. Kayama stated that Phil's accident occurred in the shorebreak. *See* Exh. P–91.

100. Although Mr. Kayama said that the shorebreak of one to one and a half feet, occasionally two feet, at Kamaole II at 8:30 to 9:00 a.m. on March 13, 1998, was not potentially dangerous, nevertheless, he posted one red flag on the beach, before Phil's accident. He could not remember if he posted more than one flag.

101. Mr. Kayama said that a red flag posted alone may remind people of the warnings noted on the five permanent signs located in the park, that people had the opportunity to see when approaching the beach, which warned of both dangerous shorebreak and strong currents (the Court notes that a strong current may not be visually detectable to a tourist). Mr. Kayama posted the flag(s) alone, in part, so that beachgoers would inquire of the lifeguard as to the meaning of the flags.

102. On March 12, 1998, the day before Phil's injury, Kayama was working as a lifeguard at Kamaole I and was involved in a rescue of a paralyzed person injured in the shorebreak.

103. On March 12, 1998, at Kamaole I, Mr. Kayama posted red flags and portable warning signs, which signs were the same type of warning signs kept in the shed at Kamaole II. Mr. Kayama stated that he posted the portable signs on March 12, 1998, because the waves were one to two feet (as measured from the back) with occasional larger sets; whereas on March 13, 1998, Mr. Kayama did not post portable signs because the waves were only one to one and a half feet, occasionally two feet.

104. Mr. Kayama felt that on March 13, 1998, the conditions did not warrant the posting of portable signs, given the size of the waves and that five permanent signs were posted.

105. On March 12, 1998, Mr. Amadeo posted portable warning signs on the beach at Kamaole II. The waves were one to three feet that morning, as measured from the back. Murray Phillips, who was injured at Kamaole II that day, did not see the portable signs.

106. Under the language of Act 190, the County did not have a duty to post portable signs at Kamaole II on March 13, 1998.

107. In any event, the absence of portable signs on March 13, 1998, is not a legal cause of Phil's injury inasmuch as there is no evidence that portable signs are effective in modifying behavior or otherwise preventing aquatic accidents. In most of the prior Kamaole I and II incidents cited by Plaintiffs, including Mr. Phillips' incident on March 12, 1998, portable signs had been posted.

108. Further, none of the members of the Roper or Rygg families relied upon the permanent warning signs or the portable warning signs, or the absence thereof, at Kamaole II, as none were aware that such signs were posted permanently, or, as to the portable signs, on occasion at that beach (other than John, who was aware of the permanent signs, but disregarded the warnings listed thereon). Moreover, the

fact that none of them saw any of the readily observable permanent signs in their treks to and along Kamaole II (other than John) suggests highly that they would have not observed portable signs had they been posted.

109. As children and adults, Phil and his sister, Mary, lead active outdoor lives. They snow skied, biked and water skied.

110. Outdoor signs were important to Phil and his family. When they hiked in the nearby national park, or went skiing, they always looked for warning signs.

111. Phil took safety issues seriously, by, among other things, requiring that his children wear helmets when riding bicycles and life preservers when boating on Flathead Lake.

112. According to Char, although Phil was a good swimmer, he had little familiarity with ocean surf or shorebreak.

113. Phil and Char had one previous trip to Hawaii before March of 1998, approximately twenty years ago. During this previous trip, Phil and Char went to Sandy Beach, on Oahu, which is known as "the neck-break capital of the world" and got jostled by waves.

114. Phil and Char had been at Sandy Beach for approximately ten minutes and were in the water for less than five minutes, when a lifeguard drove up and told them they should not be swimming there.

115. Phil and Char exited the water and left the beach soon thereafter. They never re-entered the water after getting the lifeguard's instruction.

116. The lifeguard at Sandy Beach did not give Phil and Char any warnings about shorebreak, nor did he inform them of the dangers of shorebreak.

117. The lifeguard at Sandy Beach did not advise Phil and Char that spinal injuries could occur from shorebreak.

118. Phil and his family had also gone to Daytona Beach and Flagler Beach, both in Florida, on three occasions. On those trips, Phil bodysurfed ocean waves.

119. The Roper family, along with Phil, Char, Becky and John Rygg, arrived in Kihei from Montana on the afternoon of March 12, 1998, the day preceding Phil's accident.

120. The Rygg and Roper families arrived at approximately 4:00 p.m. and proceeded directly to the Banyan.

121. Phil checked in at the Banyan. Char received a receipt of a map showing the way to their room.

122. The map advises guests to: "Please be aware that dangerous conditions can exist on all beaches. Please exercise caution and seek the advice of a lifeguard on duty."

123. There is no evidence that Phil saw this map.

124. No one at the front desk of the Banyan gave any of the Rygg family members any oral instructions regarding the beach or the ocean.

125. After taking their belongings into their respective rooms, Phil, Char, Becky, Jeff, Mary, and Reid went grocery shopping. They drove north along South Kihei Road and passed most of Kamaole II and the nearby Kamaole I Beach Park.

126. While the others were shopping, John and Jess walked from the Banyan to the beach fronting Kamaole II. In accessing the beach, they took the Rygg path.

127. The waves at Kamaole II were calm on the late afternoon of March 12, 1998.

128. Upon reaching the beach, John and Jess headed north and traversed the entire beach. They crossed the rocky outcropping at the northern end of the beach and continued north along the beach fronting Kamaole I. John and Jess reached the end of the beach and returned to the Maui Banyan on the mauka side of South Kihei Road.

129. John testified that he saw a shorebreak warning sign on his March 12, 1998,

walk, and that he passed within ten to fifteen feet of such sign. John used the Rygg path and walked along the beach behind all of the mauka-facing signs along Kamaole II and Kamaole I. He returned to the Maui Banyan on the mauka sidewalk. The closest John would have come to any sign would have been sign five as he approached and used the Rygg Path.

130. Although John testified that he interpreted the pictogram to mean that waves presented a danger when they were large enough to engulf a body, the language underneath the pictogram, which is readily readable at a distance of more than fifteen feet, indicated otherwise. This language, which read "WAVES BREAK IN SHALLOW WATER/SERIOUS INJURIES COULD OCCUR, EVEN IN SMALL SURF/IF IN DOUBT, DON'T GO OUT," in no way misled John into interpreting the sign in such a manner.

131. After returning from the grocery store, Phil, Char, Becky, Jeff, Mary, and Reid used the Rygg path to access the beach fronting Kamaole II. They remained at the beach for approximately five to ten minutes, and used the same path to exit the beach. At this time it was after sunset, although it was still light.

132. Char, Becky, Jeff, and Mary all testified that they did not see any beach warning signs on March 12, 1998.

133. On the morning of March 13, 1998, Phil and Becky went running along South Kihei Road. They jogged north for about a mile, returned to the Maui Banyan area, continued south for another half-mile, and then returned to their room. Their run took them past Kamaole II and the neighboring Kamaole I and Kamaole III beach parks.

134. Becky testified that she did not see any beach warning signs while she ran.

135. While Phil and Becky were running, Jeff, Mary, and Reid walked north along South Kihei Road for about a mile, past Kamaole II and Kamaole I. The Ropers encountered Phil and Becky near Ka-

maole I. Both Jeff and Mary testified that they did not see any warning signs that day.

136. While the others were out, Char remained in the room and read literature provided by the Maui Banyan. According to Char, she reviewed the literature to determine whether there were any safety or precautionary measures that the family should take.

137. Char has a clear recollection that she read page 26 of the Maui Banyan compendium (Exhibit C–55), which advises guests to "Please pay special attention to any warnings posted by the lifeguards. Beaches can be dangerous with shifting weather patterns." There is no evidence that this warning was communicated to Phil.

138. As Phil and Becky returned from their run, John and Jess left for a run estimated by John to be about four miles. John testified that he did not see any warning signs while on his run.

139. At approximately 8:30 a.m., shortly after they had returned from their walks and runs, Phil, Jeff, Mary, and Reid left their rooms and used the sidewalk on the Kihei end of the Banyan driveway. They crossed South Kihei Road at the driveway intersection and accessed the beach by way of the Rygg path. They did not use the crosswalk, which is located 164 feet in the Kihei direction from the corner of the Kihei end of the Banyan driveway. Jeff and Mary both testified that they did not see any beach warning sign as they walked to the beach that morning. Char testified that Phil told her that he did not see any such sign as he walked toward the beach the morning of his accident.

140. Char and Becky took the same route to the beach approximately five minutes later. Both testified that they did not see any beach warning sign as they approached the beach.

141. The Ryggs and Ropers set up their beach mats and towels near the beach end of the Rygg path.

142. The ocean appeared calm on the morning of March 13, 1998.

143. Shortly after Char and Becky arrived at the beach, Char noticed John coming down a wooden ramp. John was having an asthma attack from his exercise.

144. Both Char and Phil walked toward the ramp to speak with John, with the red flag in their direct line of vision. There is no evidence, however, that either of them noticed or saw the red flag; in fact, Char testified that she did not see the flag at that time. Char and Phil sent John back to the Banyan to rest.

145. Char and Becky then left Kamaole II to purchase beach mats from a nearby store. They headed north along South Kihei Road, traveling the length of Kamaole II.

146. While Char and Becky were away, Mary and Reid went into the ocean. Phil also entered the ocean at some point.

147. Mary and Reid played in water that was chest-high on Reid, who was five-foot-four at the time. Reid's glasses were knocked off by the impact of a wave, which went over both his and Mary's head, and Reid went to shore to inform Jeff.

148. Phil entered the ocean to help Mary look for the glasses. They searched for the glasses by feeling around with their feet. After a few minutes, Jeff began to search for the glasses in knee-deep water. Phil searched in water that was chest-deep on his six-foot-four frame.

149. As Phil and the Ropers searched for Reid's glasses, waves were coming into shore. The waves were breaking further out than the knee-deep water in which Jeff was searching.

150. After several minutes of searching, Phil concluded that they would never find Reid's glasses. The group gave up looking shortly thereafter.

151. Mary lay down and caught a strong wave which pushed her in toward shore. According to Mary's testimony, this was most likely the same wave that was the source of Phil's injury.

152. As Mary headed to shore, Phil probably also attempted to bodysurf (or perhaps swim) back to the beach.

153. Phil's decision to bodysurf toward the shore was not imprudent. Nor was Phil's conduct in assisting his nephew to look for his nephew's glasses in any way negligent.

154. A wave with an approximately three to four foot face broke over Phil as he was in approximately two feet or less of water.

155. Phil sustained a cervical injury·by striking his head on the ocean floor.

156. According to the undisputed testimony of aquatic kinesiologist Glen Egstrom, Ph.D., Phil's injury would not have occurred if Phil had been standing or walking to shore.

157. Approximately five seconds after riding her wave, Mary saw Phil floating face down in the ocean.

158. Sitting on the beach at Kamaole II, at the time, were Murray Phillips and Barbara Phillips, husband and wife, from Saskatchewan, Canada.

159. Murray Phillips was born on July 29, 1948 in Regina, Saskatchewan, Canada. He is a captain with the Regina Fire Department Suppression and Rescue Division, and has been doing that type of work for twenty-five years.

160. Murray and his wife, Barbara, were on Maui vacationing in March of 1998. They vacationed in Hawaii every other year.

161. On March 12, 1998, Murray had been in the water at Kamaole II in approximately waist deep water, forty to fifty feet from shore.

162. Murray was in approximately the same location in the water as Phil was when Phil was injured the following day.

163. While in the water on March 12, Murray was injured while bodysurfing a wave that looked substantially similar to the wave which struck Phil the following day.

164. The wave drove Murray to the sandy bottom, causing him to scrape the skin of his nose and forehead, and sustain a whiplash and shoulder injury.

165. Murray and Barbara went to Kamaole II on March 13, 1998 and walked to the beach via the Rygg path. Both testified that they did not see any posted shorebreak warning signs or a red flag.

166. Murray and Barbara sat on the beach approximately twenty feet Wailea side from the wooden ramp accessway.

167. As Murray watched the waves, he saw Phil out of the corner of his eye and became concerned about him inasmuch as Phil was in approximately the same place in the water as Murray was the day before when he was injured, with an approaching wave similar to the one that injured Murray the previous day.

168. As Murray was watching the waves, he saw a wave approaching Phil from behind him, at which time he mentioned to his wife that: "He's fucked."

169. Murray saw the wave strike Phil from behind, causing him to disappear in the water, after which Phil appeared seemingly unable to move in shallow water close to shore.

170. Murray estimated the wave's height, from the front, or its face, top to bottom, to be about four feet.

171. It did not appear to Murray that Phil had any awareness that a wave was coming from behind him which was going to break on him.

172. Barbara saw Phil for a split second look over his shoulder after which he was engulfed by an incoming wave which caused him to briefly be covered with water.

173. Jeff Roper, in the water with Phil, said that Phil had just taken a stroke when a wave came from behind him and broke on top of him.

174. Jeff testified that Phil was standing prior to taking a swimming motion towards shore, when he became horizontal to the ocean surface.

175. Phil was probably attempting to catch the wave that ultimately injured him, so that he could bodysurf toward the shore.

176. After the wave engulfed Phil, Phil disappeared and did not come up right away

177. Murray started running towards the water when Phil bobbed up, floating face down. Barbara followed him.

178. Mary also ran to assist Phil, followed by Jeff and Cary Kayama, the County water safety officer on duty.

179. Murray, Jeff, and Mary assisted in bringing Phil to shore out of the water inasmuch as Phil was unconscious at that time.

180. Phil was carried to the sand and was laid on the beach directly beneath the wooden ramp.

181. The rescue and first aid efforts of Mr. Kayama, Steven Nitura, another County employee, and other assisting persons were successful and appropriate, and well within the appropriate standards of care. The Court notes that Plaintiffs, in open court, acknowledged that they were not challenging the adequacy of the care and treatment Phil received after his injury (such as the first aid rendered by Messrs. Kayama and Nitura).

182. While Phil was receiving treatment, Char and Becky were returning from the store. They accessed the beach from either of the first two paths on the northern end of the park. Both of these paths have "Dangerous Shorebreak" and "Strong Current" signs immediately along-

**1154**

side of them (signs one and two), which Char and Becky did not see.

183. Plaintiffs have characterized the locations of signs one and two as optimal, as did Mr. Goto.

184. Char and Becky walked along the beach to where they had left the other family members.

185. As they walked across the beach, Char and Becky noticed a red flag. Although Char believes the flag to have been posted in or near the vegetation line, all other witnesses remember the flag to have been located approximately halfway between the vegetation line and the ocean. Both Char and Becky took the red flag to be a caution of some sort.

186. Subsequently, John, who had been at the Maui Banyan recovering from his asthma attack, went to the beach. He did not see Phil, who had been placed in the ambulance, or the people attending to him.

187. John saw a red flag which he understood to be a caution. He recalls the red flag being located makai of the lifeguard tower in the middle of the sand.

188. John entered the ocean and bodysurfed approximately two waves. He remained in the ocean for five to ten minutes.

189. Phil was successfully revived and did not sustain any hypoxic brain damage. He was stabilized and transported for hospital care, where it was determined that Phil had sustained spinal cord damage and had been rendered quadriplegic. Phil died a few months later from Adult Respiratory Distress Syndrome, which was causally related to his spinal injury.

190. With the exception of John, none of the Rygg and Roper family members saw, or recalls seeing, any beach warning signs, or a red flag on the beach at Kamaole II, prior to Phil's injury.

191. Neither Murray nor Barbara Phillips saw any beach warning signs or a red flag.

192. The Court notes that regardless of the exact location of the warning signs, with the exception of John, none of Rygg family members testified that they saw any beach warning signs, despite having numerous opportunities to observe such signs. Most notably, Char and Becky both walked along an accessway that has been characterized by Plaintiffs as having a warning sign in an "optimal" location (within five to ten feet of the accessway).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and parties in this case.

2. The County had a duty to warn the public of the extremely dangerous shorebreak present at Kamaole II, as it is a condition that is known by the County to be extremely dangerous, typically present at Kamaole II, and posing a risk of serious injury. *See* Act 190. Under the common law, the duty had been to warn users of extremely dangerous conditions in the ocean that "were not known or obvious to persons of ordinary intelligence, and which were known or in the exercise of reasonable care ought to have been known" to the County. *Kaczmarczyk v. City and County of Honolulu*, 65 Haw. 612, 656 P.2d 89, 92 (1982).

3. The Court notes the following legislative history associated with Act 190:

Your Committee finds that with some changes, this bill will more clearly outline individual rights and expectations while clarifying the duties of the counties to warn of certain dangerous conditions, and thus provide a greater measure of protection for the counties....

Sen. Com. Rep., Intergovernmental Relations and International Affairs on S.B. No. 865, H. 18–1190, Reg. Sess. (Haw.1995).

... Your Committee finds that an equitable balance must be struck that balances the privilege of enjoying the public beaches and the duty and ability of the government to take reasonable mea-

sures to provide adequate warning of potential danger.

. . .

This bill would establish the duty of the State and counties to warn of dangerous shorebreaks or strong ocean current if the conditions are extremely dangerous, typical for the beach, and if they pose a risk of serious injury or death.

Conf. Com. Rep. No. 98 on S.B. No. 865, S. 18–98, Reg. Sess. (Haw.1996).

4. Because the shorebreak warning signs at Kamaole II, on March 13, 1998, were not approved by the Task Force or the chairperson of the BLNR, the County is not entitled to any conclusive presumption that any warnings given by it pertaining to shorebreak were legally adequate or sufficient. The County acknowledged, prior to trial, that it was not entitled to such a presumption because it failed to use the Task Force approved pictogram on its shorebreak warning signs at Kamaole II.

5. In passing the Act, the Legislature intended to balance the government's duties against the public's privilege to enjoy beaches in a responsible manner. In furtherance of this policy, the Legislature established a process by which public entities can provide beach warnings that are both meaningful and legally adequate. It is the Legislature's judgment that the codified duty to warn is satisfied through the use of permanent signage.

■ 6. The codified duty to warn supersedes the common law duty with respect to extremely dangerous shorebreak and strong currents. The Act specifically provides that the County shall not have a duty to warn other than as provided in the Act. Therefore, the County does not have a duty to post flags or portable signs.

■ 7. The Task Force promulgated a shorebreak warning sign that the BLNR chair approved for use at all appropriate beach parks. This approval does not create a mandatory standard of care; governmental entities are not required to use

such signs unless they wish to secure the immunity provided by Act 190.

8. Although the use of a different pictogram precludes the County from asserting the conclusive presumption afforded by the Act, the substantial similarity between the Task Force and Kamaole II signs is significant evidence that the Kamaole II signs were adequate, particularly inasmuch as there is no evidence that the Kamaole II pictogram is any less efficacious than the Task Force pictogram.

■ 9. The shorebreak existing at certain times at Kamaole II was an extremely dangerous condition typical to that beach, of which the County was aware or should have been aware, and about which the County had a duty to warn the public.

■ 10. Although the use of a different pictogram precludes the county from asserting the conclusive presumption afforded by Act 190, sign five posted near the Rygg path on March 13, 1998, at Kamaole II, was sufficient to adequately warn anyone using that path of the extremely dangerous shorebreak existing at Kamaole II, and fulfilled the County's duty to warn. Similarly, the other four signs gave adequate warning to anyone using any other access to the beach at Kamaole II. The old pictogram, which displayed a wave of approximately four feet, as measured from the front, gave a more adequate warning of the shorebreak conditions existing at Kamaole II on March 13, 1998, than the Task Force approved pictogram, which showed a wave with a face of approximately two feet.

■ 11. The presence of the red flag should cause a reasonable person to inquire of the lifeguard not only as to the potential dangers of shorebreak, but also of the possible unseen current.

12. Sign five was posted at a location approved by the Task Force, and reasonably complied with the Goto criteria.

13. The five signs posted at Kamaole II on March 13, 1998, gave adequate warn-

ing to anyone using any of the beach accessways at Kamaole II.

14. Sign five, specifically, was in the obvious vision of and gave adequate warning to anyone using the Rygg path, including Mr. Rygg, of the extremely dangerous shorebreak existing at Kamaole II. Mr. Rygg should have seen and read sign five as he approached the Rygg path heading towards the beach.

15. Walking toward the Rygg path, the printed words "WARNING/DANGEROUS SHOREBREAK" were clearly readible, and given such language, a reasonable person would have approached the sign more closely to read the smaller language regarding the danger of small surf, depending on whether one's eyesight required a closer view to read such language. The vivid coloration of the sign and the pictogram should also have caused a reasonable person to approach to read the smaller language. Yet even if one was unable to read the smaller language regarding danger of small surf, and failed to approach the sign more closely, the larger words warning of dangerous shorebreak and the pictogram alone were adequate warning of the extremely dangerous shorebreak on March 13, 1998.

16. Furthermore, the red flag served as a reminder of the permanent signs warning of both dangerous shorebreak and strong current.

17. Under the language of Act 190, the County did not have a duty to post portable signs at Kamaole II on March 13, 1998.

18. The one to one and one-half foot waves on March 13, 1998, did not warrant posting portable signs as to anyone who might have relied on the County's practice of sometimes posting portable signs regarding dangerous shorebreak. In any event, the permanent signs warning of dangerous shorebreak adequately warned anyone of such condition on March 13, 1998. Moreover, the County posted a red flag on the beach, which should have reminded anyone on the beach of the perma-

nent signs warning of dangerous shorebreak.

19. Because Plaintiffs never knew that the County used portable signs to warn of dangerous conditions existing at Kamaole II, Plaintiffs never relied upon the use of such signs or the absence thereof. The fact that the County did not post such signs on March 13, 1998, is thus a non-issue for lack of actual reliance. *See Geremia v. State of Hawaii*, 58 Haw. 502, 573 P.2d 107, 111–12 (1977).

20. In light of the adequate placement of signs, and the adequacy of the design of such signs, the County satisfied any duty it owed to Mr. Rygg, and was not negligent in that it provided adequate warnings. The County was not factually or legally responsible for the injuries sustained by Mr. Rygg.

21. Because the Court has determined that the County adequately warned an ordinary person exercising reasonable care using the Rygg path, the Court need not address whether Mr. Rygg exercised reasonable care or was contributorily negligent on March 13, 1998. The Court notes, however, that Mr. Rygg was not in any way negligent in swimming or bodysurfing toward the shore.

22. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

IT IS SO ORDERED.

## ORDER DENYING PLAINTIFFS' MOTION TO AMEND (EXCEPT AS TO FINAL SENTENCE OF FINDINGS OF FACT NO. 54) OR MAKE ADDITIONAL FINDINGS OF FACT AND/OR CONCLUSIONS OF LAW, AND/OR AMENDMENT OF JUDGMENT AND/OR FOR NEW TRIAL

### BACKGROUND

This matter came on for bench trial before this Court beginning June 20, 2000. After having heard and weighed all the

evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having visited and examined the site of the accident, having heard the arguments of counsel and considered the memoranda submitted, the Court issued a Decision, Findings of Fact and Conclusions of Law ("8/3/00 Order") on August 3, 2000, holding that the County of Maui ("County" or "Defendant") fulfilled its duty of providing adequate warning of the extremely dangerous shorebreak present at Kamaole II on March 13, 1998.

On August 16, 2000, Plaintiffs filed a Motion to Amend or Make Additional Findings of Fact and/or Conclusions of Law, and/or Amendment of Judgment and/or for New Trial. Plaintiffs filed an Amended Memorandum on August 21, 2000, and a Supplement the following day. Plaintiff subsequently filed a Combined Supplement (Kreuger) to Plaintiffs' Motions, on August 23, 2000. Plaintiffs' Combined Supplement was intended to replace Plaintiffs' Amended Memorandum and Supplement.[1]

Defendant filed an Opposition on August 29, 2000.

Pursuant to Local Rule 7.2(d), the Court finds this matter suitable for disposition without hearing.

### STANDARD

### I MOTIONS TO AMEND OR MAKE ADDITIONAL FINDINGS OF FACT OR CONCLUSIONS OF LAW

Under Rule 52 of the Federal Rules of Civil Procedure, trial courts may amend their findings or make additional findings upon a party's motion filed within ten days of the entry of judgment. The court shall not set aside findings of fact unless clearly erroneous:

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Fed. R. Civ. Pro. 42(a).

### II MOTIONS TO AMEND JUDGMENT

■ A party may file a motion to alter or amend judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Reconsideration of a judgment after its entry is "an extraordinary remedy which should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir.1999) (quoting 11 Wright, *Federal Practice and Procedure* § 2810.1 (2d ed.1995)). A Rule 59(e) motion "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir.1999).

There are four basic grounds upon which a Rule 59(e) motion may be granted:

First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice.... Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law.

*McDowell*, 197 F.3d at 1255 n. 1 (quoting 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane *Federal Practice and Procedure* § 2810.1 (2d ed.1995)).

### III MOTION FOR NEW TRIAL

Rule 59(a)(2) of the Federal Rules of Civil Procedure provides that a trial court may grant a new trial "in an action tried

---

1. The Court notes that Plaintiffs' Supplement exceeds the thirty (30) page limitation provided in Local Rule 7.5 and does not contain a table of contents or a table of authorities as required by Local Rule 7.5.

without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States."

■ There are three grounds for granting new trials in court-tried actions under Rule 59(a)(2): "(1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence." *Brown v. Wright*, 588 F.2d 708 (9th Cir.1978) (citing 6A *Moore's Federal Practice* § 59.07 at 59–94). Harmless errors encountered during the course of a proceeding are not proper grounds for new trial or amendment of a judgment:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. Pro. 61.

### DISCUSSION

Plaintiffs make a number of objections to specific findings and conclusions of the Court. Rather than address each objection in turn, many of which are repeated numerous times, the Court has grouped Plaintiffs' objections and will address them in that manner.

Plaintiffs argue that the Kamaole II pictogram did not accurately depict or resemble the ocean conditions existing on the day of Mr. Rygg's accident. Plaintiffs assert that on March 13, 1998, the average waves were one to two feet. The Court notes that Plaintiffs fail to specify whether their estimates of wave height on March 13, 1998, are as measured from the front or the back. Apparently Plaintiffs refer to the height of the face of the waves. Dr. Grigg testified that the face of a wave is ordinarily twice the height of the back of a wave.

On the other hand, the Water Safety Log for March 13, 1998, reported the waves as having a height of one to one and a half feet, occasionally two feet, as measured from the back (which would have a face of four feet). The wave that injured Mr. Rygg had a face of three to four feet. The Court found that the old pictogram depicted a wave with a face of approximately four feet; whereas the new pictogram appears to show a wave with a face of one to two feet. Plaintiffs acknowledge that the old pictogram showed a wave of approximately five feet. *See* Pls' Combined Supp., at 22. Moreover, it is unclear whether the bent-over person depicted in the old pictogram is a man, woman, or child; which would make a difference in the size of the depicted bent-over person and hence the height of the depicted wave. Even Plaintiff's counsel admitted that the figure could be of a man or a woman. *See* Tr. 1–34:23—1:35:4. Further, Plaintiffs report Mr. Goto's estimate of the wave depicted on the old pictogram: "Goto testified that a casual bystander would appraise the height of the shorebreak shown on the sign to be 4.5′ to 6′." Pls' Combined Supp., at 22. And Dr. Egstrom testified that the Kamaole II pictogram depicted a wave of approximately four to five feet. Tr. 8–167:8—8–167:11

The Court's finding that "[t]he ocean conditions existing on March 13, 1998, including the wave involved in Mr. Rygg's injury, were more closely depicted in the Kamaole II pictogram in use that day, than in the Task Force pictogram" is consistent with and supported by the evidence. See 8/3/00 Order ¶ 56, at 15.

The evidence suggests that the wave in which Mr. Rygg was injured was approximately three to four feet, as measured

from the front.[2] This is consistent with Mr. Phillips' testimony that the wave that injured Mr. Rygg measured four feet from the front, the Water Safety Officer Log, which reports the waves as measuring one to one and a half feet, occasionally two feet (measured from the back, which would have a face of four feet), and Ms. Roper's testimony that a wave broke over her and her son Reid, knocking Reid over. This supports the Court's conclusion that the wave that injured Mr. Rygg was more accurately depicted in the old pictogram than the new, Task Force approved one which depicted a wave with a face of one to two feet.

Plaintiffs' argument that the finding of adequacy "flies in the face of the legislative and Task Force determination that the old sign did not deserve a presumption of adequacy" ignores two important facts.[3] First, this Court did not conclude that the Kamaole II sign deserves a *presumption* of adequacy; rather, the Court concluded that the sign adequately warned anyone using the Rygg path of the extremely dangerous shorebreak that existed on March 13, 1998. This in no way equates to a *presumption* of adequacy. Second, as discussed infra, Plaintiffs ignore testimony that suggests that the Task Force changed the pictogram to one depicting a smaller wave based on an inaccurate interpretation of data. Dr. Grigg suggested that the task force changed the pictogram to depict the much smaller wave based on this erroneous interpretation.

Plaintiffs object to this Court's determination that the differences between the Kamaole II pictogram as it existed on March 13, 1998 ("Kamaole II pictogram"), and the Task Force approved pictogram

are insignificant from the perspective of an ordinary beachgoer. *See* Pls' Combined Supp. at 2, 19–21, 31. Plaintiffs argue that such a finding is inconsistent with the evidence because Mr. Rygg's son, John, testified that when he saw the Kamaole II pictogram, he concluded that the shorebreak depicted on the sign did not exist that day, as the waves appeared smaller than that depicted on the warning sign.[4] Plaintiffs also point to the Task Force's decision to change the existing pictogram to one depicting a smaller wave as evidence that the old pictogram is significantly different than the Task Force-approved one. Plaintiffs further argue the Court erred in concluding that there is no evidence that the Kamaole II pictogram is less efficacious than the Task Force approved pictogram.

Regarding the Task Force's decision to change the pictogram to one depicting a smaller wave, there was testimony that the decision to do so was based on a faulty interpretation of data regarding the size of waves in which the majority of shorebreak accidents occur. The Court reminds Plaintiffs that Dr. Grigg misinterpreted the Howe data as reporting that 90 percent of shorebreak accidents occur in shorebreak of three feet or less as measured from the *front.* Dr. Grigg thus misled the Task Force when he urged them to change the existing pictogram to one depicting a smaller wave, as Mr. Goto testified the Howe study actually measured the waves from the *back* (which equates to shorebreak of *six feet* or less as measured from the front).

Mr. Goto testified that he felt the old pictogram provided an adequate warning.

---

**2.** Even Plaintiffs' counsel took this position. *See* Tr. 12–120:1—12–120:2.

**3.** This is equally true of Plaintiffs' assertion that "the permanent sign in place was, under the law, the *wrong* sign." Pls' Combined Supp., at 31 (emphasis added). Because a warning sign is not entitled to a conclusive presumption of adequacy does not equate to such a sign being "the wrong sign." Indeed,

such an assertion ignores the fact that a sign *not* entitled to a presumption of adequacy may nonetheless provide adequate warning—as sign five did in this case.

**4.** However, as discussed *supra*, the size of the wave in the Kamaole II pictogram in fact was of the approximate size of the wave which injured Mr. Rygg.

However, in reviewing the transcript the Court was unable to find any testimony by Mr. Goto as to whether or not the old pictogram gave a more adequate warning of the shorebreak conditions existing at Kamaole II on March 13, 1998 than the newer, Task Force approved pictogram; so to that extent Finding of Fact No. 54 is amended by deleting its final sentence. Yet this deletion in no manner changes the Court's finding that the old pictogram did give such a more adequate warning.

Moreover, in addition to the adequate warning of the Kamaole II pictogram, the Court found that the vivid coloration of the sign, and the large "WARNING" and "DANGEROUS SHOREBREAK" language should have caused a reasonable person to approach to read the smaller language (in the event, depending upon one's eyesight, he or she was unable to otherwise read the smaller language). Even Plaintiffs' counsel admitted that the printed warning on the signs sufficiently warns of the dangers of shorebreak in small surf. *See* Tr. 11–12:21—11–12:23 ("[O]ur position is the understandable language to a flat-lander is the little language."). Even Char Rygg testified that had she seen either shorebreak sign, she would have reacted the same way:

Q. All right. If you'd like, I can get the two signs that we have, but as I understand it, whether you saw the sign that had the large wave on it or the small wave on it, either way you would have done the same thing, you would have sought out information, correct?
A Yes.

Tr. 6–19:12—6–91:17. Clearly, the difference between the old and new pictograms was not significant from Char's perspective, and there was no testimony to the contrary. The Court's finding that the differences between the two signs are insignificant from the perspective of an ordinary beachgoer is thus supported by the evidence.

Additionally, Plaintiffs are incorrect in their assertion that it is "untrue that there is no evidence in this record that the Kamaole II pictogram is less efficacious than the Task Force pictogram." Pls' Combined Supp., at 20. First, Dr. Grigg and Mr. Goto testified that there is no conclusive data concerning the efficacy of the new Task Force approved signs as opposed to that of the old sign. The Court notes that even Plaintiffs' counsel agreed that the new pictogram may not provide adequate warning of dangerous shorebreak:

THE COURT: Unfortunately, the new pictogram looks somewhat like a cartoon.

MR. KRUEGER: I'm not—I didn't design it. I don't stand by it and I don't recommend it necessarily. I think—

THE COURT: Your expert designed it, didn't he?

MR. KRUEGER: I don't know that he designed it. I know that the idea was one of his and a few others. I think they could have done better.

Tr. 12–120:16—12–120:23.

Plaintiffs argue that during the Court's visitation to Kamaole II, the Court failed to view the beach park and warning signs therein as an "ordinary beachgoer," as the Court was searching for warning signs and not casually walking about the grounds as an ordinary beachgoer would. Thus, Plaintiffs assert that the Court's viewing was an unrealistic or tainted one, as evidenced by the seven "ordinary beachgoer" witnesses Plaintiffs brought forth, none of whom (except John) profess to have seen the warning sign adjacent to the Rygg path on the morning of Mr. Rygg's accident. Plaintiffs argue that the Court's assessment that the warning signs present at Kamaole II on the date at issue were "observable" does not equate to a likelihood that an ordinary beachgoer would observe the warning sign at issue; thus, Plaintiffs assert that the Court erroneously concluded that the sign five was adequately placed. Plaintiffs also contest this Court's conclusion that the placing of sign

five reasonably complied with the Goto criteria.

Regarding compliance with the Goto criteria, the Court first notes that both Messrs. Goto and Nagata testified that the Goto criteria were simply guidelines (as opposed to rules regulating signage placement). Furthermore, as Defendant notes, the Court's determination was supported by the evidence, for the Goto criteria did not require that every path be signed at its inception,[5] but rather required that the signs be placed in a reasonably visible location. Mr. Goto's testimony is consistent with and supports this conclusion:

> THE COURT: Well, are you saying then that putting the sign within five or ten feet of the entry to the Rygg pathway would be the best place to put the sign, but that where sign five was meets the criteria with respect to the Rygg pathway?
>
> THE WITNESS: Yes, Your Honor, I think that's what I'm trying to say.

Tr. 10–105:15—10–104:21. Although it may be true that warnings may be more likely to be seen the closer signs are posted to the inception of a path, the evidence suggested that such placements are not necessary, may not be reasonable, and are not required for compliance with the Goto criteria.

■ Regarding the Court's visitation, contrary to Plaintiffs' contentions, the Court did indeed view the premises from the perspective of a mainland visitor entering Kamaole II for the first time, *see* Tr. 11–3 at 13–23, and specifically noted when it was doing otherwise. *See, e.g.,* Tr. 11–35 at 6–8 ("The lifeguard station is visible, *if you're looking for it,* from the corner by the Maui Banyan.") (emphasis added).

Moreover, when making its observations, the Court not only noted that certain things were "observable," but went even further to say that some were *"very* observable," *"readily* observable," or even "hard to miss." Such language implies that even a first-time visitor to Kamaole II and ordinary beachgoer would make similar observations. For example, the Court noted that sign five would be difficult *not* to see when crossing the street from the Maui Banyan and entering the beach from the Rygg path. *See* Tr. 11–16, at 7–17. Thus, from the perspective of an ordinary beachgoer, sign five not only was observable, but was in an open and obvious location. The Court noted the same about the remaining signs, *see* Tr. 11–34 at 9–10, the red flag, *see* Tr. 11–19 at 24–25 to 11–20 at 1 ("[F]rom where the Ryggs were sitting on the beach, the red flag is *very* observable as it is posted today on the sand beach.") (emphasis added) and the lifeguard stand, *see* Tr. 11–20, at 9–10 ("[T]he lifeguard station is literally *readily* observable ....") (emphasis added).

Moreover, it is the attention-getting quality of sign five that makes this sign readily apparent to beachgoers. Indeed, even Plaintiffs' counsel admitted that the attention-getting quality of the warning sign present at the time of Mr. Rygg's accident is significant. *See* Tr. 11–12 at 24–25 to 11–13 at 1–2; *see also* Tr. 11–32 at 12–14 and the testimony of Dr. Egstrom at Tr. 8–166. The Court disagrees with Plaintiffs that the location of the sign precluded the sign from being an "attention-getter."

In sum, despite testimony from a number of adults who reported that they failed to see sign five when using the Rygg path,

---

**5.** Plaintiffs' literal interpretation of "optimal" in the Goto criteria would require that all beach accessways be signed at the inception of each path; testimony revealed, however, that the Goto criteria did not require, or indeed contemplate such signage. *See* Tr. 7–106:24—7–107:1 (reporting Nagata testimony that the Task Force did not require that every accessway be signed). The absence of a warning sign directly adjacent to an accessway is not evidence of inadequate placement. Here, the Court did not find that sign five was in the *best* location at the time of the accident; rather, the Court concluded that the location of sign five was *adequate.*

the Court is mindful of the possibility of fading memory, especially when one considers that the subject of warning signs was not even brought up to any members of the Rygg family until approximately a month had lapsed since Mr. Rygg's accident, when Char approached Mr. Morrison.

Plaintiffs further object to this Court's conclusions that the presence of the red flag should cause a reasonable person to inquire of the lifeguard as to the potential dangers of shorebreak, and served as a reminder of the permanent signs warning of both dangerous shorebreak and strong current.

Plaintiffs argue that such a conclusion is in error, given the expert testimony that a red flag alone is meaningless and does not even serve as an "attention getter," and Char's testimony that upon seeing the flag she wondered whether it was a warning. *See* Pls' Combined Supp., at 24. Plaintiffs also assert that the flag was not placed on the beach until the time of Mr. Rygg's injury. *See id.* at 31.

The Court's conclusion regarding the red flag is consistent with Mr. Kayama's testimony and the Court's finding:

> Mr. Kayama said that a red flag posted alone may remind people of the warnings noted on the five permanent signs located in the park, that people had the opportunity to see when approaching the beach, which warned of both dangerous shorebreak and strong currents (the Court notes that a strong current may not be visually detectable to a tourist). Mr. Kayama posted the flag(s) alone, in part, so that beachgoers would inquire of the lifeguard as to the meaning of the flags.

8/3/00 Order ¶ 101, at 22–23. The Court's finding is consistent with Mr. Kayama's testimony of the same. *See* Tr. 5–16:13—5–16:22 (reporting Kayama's testimony of same); Tr. 5–67:3—5–67:7 (reporting read-

ing of deposition testimony where Kayama stated "a lot of people do come up to us and ask us what's the red flag because normally they don't see it out."). Moreover, both John and Becky interpreted the flag as a warning of some sort (although unfortunately they did not notice the flag until after the accident). Mr. Kayama further testified that he posted one red flag on the beach, before Mr. Rygg's accident, and the Water Safety Officer Station Log reflects that flags were posted at 8:15 a.m. *See* Pls' Ex. 90.

The evidence thus supports this Court's conclusions regarding the red flag that was posted on the morning of Mr. Rygg's accident.

Plaintiffs object to this Court's findings and conclusions regarding the posting of portable signs. Plaintiffs argue that Act 190 does not address portable signs, and if such signs are required to provide adequate warning, the County was required to post such signs. Plaintiffs further object to this Court's conclusions that the absence of portable signs was not a legal cause of Mr. Rygg's injury, and that Act 190 supersedes the common law duty to warn with respect to extremely dangerous shorebreak and strong currents.

The Court stands by its conclusion that Act 190 codified the duty to warn with respect to extremely dangerous shorebreak and strong currents. In order to qualify for the conclusive presumption of adequacy provided by Act 190, signage must be approved as to design and placement by the Board of Land and Natural Resources ("BLNR") chairman in consultation with the Task Force. This qualification requirement contemplated the use of permanent signs; as permanent signs that are approved in this manner are thus entitled to a conclusive presumption of adequacy, thus superseding any common law duty to warn.[6] The County has no duty to

---

**6.** Act 190 clearly contemplated that permanent, as opposed to portable signs, would be afforded a conclusive presumption of adequa-

cy, as the Act provides that the signs must be approved as to *location*. As Defendant notes, "[if the Task Force were to designate a partic-

 

place portable signs where they have placed permanent signs that are entitled to such a conclusive presumption. If this standard is not met, however, the usage of portable signs is not precluded by the statute.

Additionally, this Court's conclusion that "[b]ecause Plaintiffs never knew that the County used portable signs to warn of dangerous conditions existing at Kamaole II, Plaintiffs never relied upon the use of such signs or the absence thereof" is not contrary to law. *See* 8/3/00 Order ¶ 19, at 42. This conclusion relates to Plaintiffs' assertion at trial that the County assumed a duty to post portable signs. The Court's conclusion cites to *Geremia v. State of Hawaii*, 58 Haw. 502, 573 P.2d 107, 111–12 (1977), in which the Hawaii Supreme Court found that plaintiffs were foreclosed from arguing that they were misled and induced into a false sense of security by defendant's inadequate sign because the evidence suggested that plaintiffs had not seen the sign. Here, Plaintiffs are precluded from arguing that they were induced into a false sense of security by the absence of portable signs, because Plaintiffs never saw any portable signs and did not have any actual reliance thereon.

In sum, the evidence clearly established that there was an adequate sign warning of the extremely dangerous shorebreak that injured Mr. Rygg on March 13, 1998, and that the sign was adequately placed and positioned where anyone passing over the Rygg path entering Kamaole II on that day—as Mr. Rygg did—should have seen the sign and have been aware of the shorebreak dangers that existed at Kamaole II on that day. As stated in Finding of Fact No. 63, the site visit gave the Court a much better perspective of the entire park and beach area of Kamaole II than was depicted by the photographs and video, especially because the park is much

more compact and smaller than depicted in the photographs and video. It was manifestly clear, as stated in Conclusion of Law No. 14, that Sign 5 was in the obvious vision of and gave adequate warning to anyone using the Rygg path, including Mr. Rygg, of the extremely dangerous shorebreak existing at Kamaole II. Defendant thus fulfilled its duty of providing adequate warning of the extremely dangerous shorebreak present at Kamaole II on March 13, 1998.

### CONCLUSION

The Court finds Plaintiff's motions are without merit and accordingly DENIES Plaintiffs' Motion to Amend or Make Additional Findings of Fact and/or Conclusions of Law, and/or Amendment of Judgment and/or for New Trial, except that the Court deletes the final sentence of Findings of Fact No. 54.

IT IS SO ORDERED.

---

ular location for the ... portable signs, the ... signs would lose their 'portability;' they could not be relocated to address daily conditions.]" Def's Mem. Opp., at 15. Moreover,

Act 190 requires the County to report any removals of the approved signs. Clearly, this provision is referring to the removal of permanent, and not portable signs.